# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Bradford Nunan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a criminal complaint charging Kevin Bell, also known as Ronen Stoloff, with making a threat to the life of, and to inflict bodily harm upon, the President of the United States, in violation of 18 U.S.C. § 871(a).

2.      I am a Special Agent with the United States Secret Service ("USSS") assigned to the Portland Maine Resident Office ("PME"). I have been a Special Agent with the USSS since April 2007. In my duties as a Special Agent, I have gained training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, the use of lawfully obtained evidence and data and various other procedures. Through my employment, I have conducted investigations relating to violations of federal law, including threats against the President.

3.      As a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detection, investigation, and prosecution of violations of Federal criminal laws. The USSS has jurisdiction to investigate offenses arising under 18 U.S.C. § 871, which involve threats against the President of the United States and successors to the Presidency.

4.      The facts set forth in this affidavit are based upon my personal knowledge, information obtained during my participation in this investigation, as well as that of other law enforcement officers—including special agents from the Federal Bureau of Investigation ("FBI"), other special agents with the USSS, and law enforcement officers

1

from the Bridgton, Maine Police Department ("BRIDGTON")—involved in this investigation or a related state investigation, records furnished to me in my official capacity, and information gained through my training and experience, all of which I believe to be reliable.

5. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested complaint.

6. Based on my training and experience and the facts as set forth in this affidavit, I submit that probable cause exists to believe that on about April 5, 2025, Kevin Bell, also known as Ronen Stoloff, knowingly and willfully made a threat to take the life of, and to inflict bodily harm upon, the President of the United States in violation of 18 U.S.C. § 871(a).

## STATUTORY AUTHORITY

7. Section 871(a) of Title 18 of the United States Code prohibits a person from knowingly or willfully making a threat to take the life of, to kidnap, or to inflict bodily injury upon the President of the United States.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

### Prior Law Enforcement Contacts with Bell in December 2023 and February 2025

8. Based upon information and records provided by the FBI, I am aware that the FBI encountered KEVIN BELL (hereinafter, "BELL"), also known as Ronen Stoloff, on December 14, 2023, after BELL made concerning statements on YouTube. Those statements included that he had purchased a plane ticket to Kansas City, Missouri, for December 14, 2023, and intended to overdose on Zoloft during the flight to cause an emergency landing. During an interview with the FBI, BELL admitted to posting the

2

video on YouTube. BELL was admonished during this interview that, if he continued to make communications that were threatening to himself or others, he may be subject to criminal charges. BELL acknowledged the FBI's admonishment and agreed that making communications on YouTube were not a productive way to air his grievances.

9. I am aware from the FBI that BRIDGTON took BELL into protective custody for a crisis evaluation in February 2025 after BELL reportedly made one or more threatening statements to a Maine mental health crisis hotline.[1] I am also aware from the FBI that BRIDGTON has taken BELL into protective custody on one or more occasions, other than what is mentioned above.

## BELL's Conduct on April 5, 2025

10. Based upon information and records provided by the FBI, including information and records from BRIDGTON, I am aware of the following.

11. On April 5, 2025, a Department of Public Safety Senior Investigator for the State of Maine (hereinafter, the "OFFICER") provided information to the FBI regarding threats spoken directly to him by BELL on April 5, 2025. The events described by the OFFICER are as follows:[2]

---

[1] From information shared by the FBI, I understand, in summary, those statements included "I'm planning to kill my psychiatrist at my next appointment on Monday. So do you want to talk me out of it?" BELL suggested that, if he was "outpatient" it could be a serious problem, that the psychiatrist would die and he would be in prison for life. BELL identified himself as "Yannis" in the call. Sanford PD used an open-source search tool to identify Verizon as the carrier for the phone number involved in the call. Sanford PD obtained records or information from Verizon, including subscriber information that identified the account for the phone number—which was likely used by a Tracfone—as assigned to Kevin Bell with a listed address in Westbrook, Maine.

[2] The OFFICER provided the FBI with an initial summary of the events on April 5, 2025. That initial summary did not include the specific language of the threats described herein. The OFFICER separately disclosed BELL's statements to the FBI. On April 6, 2025, an FBI special agent contacted the OFFICER to confirm the words that BELL spoke, at which time the OFFICER clarified that BELL stated either, "I'll try to shoot him" or "I'll just shoot him."

3

a. On April 5, 2025, the OFFICER was having lunch at a restaurant in Bridgton, Maine. The OFFICER was "on call" but was not in uniform and was instead in "plain clothes." The OFFICER was driving an unmarked Department of Public Safety vehicle, which was parked in the parking lot of the restaurant.

b. The OFFICER was seated at the bar of the restaurant and noticed an individual, later identified as BELL, looking through the windows of the OFFICER's unmarked car.

c. The OFFICER was able to identify BELL by asking a restaurant employee to capture the license plate of the vehicle BELL got out of.

   i. The restaurant employee provided a photograph of the license plate to the OFFICER, who relayed that information to the Augusta Regional Command Center ("Augusta RCC") via e-mail and requested driver's license and registration information on the license plate. The Augusta RCC called the OFFICER and relayed the owner of the vehicle was BELL.

   ii. Additionally, the OFFICER contacted BRIDGTON to inquire about who BELL was based on a grievance BELL recounted to the OFFICER involving BRIDGTON losing BELL'S gloves during one of their encounters—BELL told the OFFICER he sued BRIDGTON for this loss. BRIDGTON provided the name of BELL as someone matching that description.

d. BELL walked into the restaurant and sat at the end of the bar to the left of the OFFICER. After some time, BELL inquired with the restaurant

employees as to who owned the black truck that was parked outside. A restaurant employee indicated it was the OFFICER's. BELL moved down the bar approximately five spots to sit one seat away from the OFFICER.

e. I have reviewed a screen capture from video surveillance at the restaurant showing BELL speaking with the OFFICER, and I know the person sitting to the OFFICER's left to be consistent with the photograph of BELL associated with his Maine driver's license.

f. BELL then began speaking to the OFFICER. BELL provided some historical information to the OFFICER related to previous interactions he had with law enforcement over the years. BELL went on to discuss how he has made comments on various social media platforms that have got him in trouble with the USSS and more recently with the FBI. BELL further stated his grievance with the FBI and law enforcement's ability to locate him no matter where he goes. BELL began asking the OFFICER about cell phone tracking and Fourth Amendment violations after stating he was a missing/endangered person out of Nevada or Missouri but they found him in Maine.

g. At some point in the conversation, BELL made a threat to the President of the United States ("POTUS"), by stating, "I wanted to shoot Bush but didn't, but now Trump is in and I don't care for him," and then continuing to say either, "I'll try to shoot him" or "I'll just shoot him." After making these comments, BELL stated that BELL needed "to stop making comments about killing the President," adding he needed to stop talking about it because he was going to get in trouble. BELL continued to discuss

5

      his hatred for Former POTUS ("FPOTUS") George W. Bush but indicated he never acted on those thoughts.[3]

  h. In addition to making threats towards POTUS, BELL made additional statements to the OFFICER, including that he ". . . is able to take over a plane and crash it, hurting a lot more people." BELL reiterated to the OFFICER that he was surprised he is still able to fly and that the government still trusts him with a plane, stating he can fly undetected out of "Eastern Slopes"[4] to do anything he wants, "like fly to DC."

  i. The OFFICER began recording the conversation after speaking with BELL for approximately fifteen minutes. The recording is approximately 14 minutes long and ended when BELL left the restaurant. In the recording, BELL stated he knew saying threats is wrong, "...whether that's at a diner, or, ya know, in person, or flying, or anywhere." BELL also stated he was a "loose cannon" in his twenties and he "didn't like um, President Bush, and I think, I think that's when it all started . . . ." In the recording, BELL discussed how a lot of people also do not like President Trump, that it was not his place to say and it was up to those people if they did not like President Trump, like when then-Former-President Trump was "almost

---

[3] From a review of USSS records, I am aware that USSS personnel interviewed BELL on December 16, 2003. At that time, BELL was still going by his birth name of Ronen Stoloff. USSS interviewed BELL regarding a potentially threatening statement that BELL sent via email about FPOTUS Bush—the statement was along the lines of "I hope POTUS visits Iraq and gets assassinated (sic)." In the interview with USSS, BELL admitted to sending the email and stated he was expressing his feelings towards then-President Bush but had no intention of harming him. The matter resulted in no federal charges.

[4] Eastern Slopes is a regional airport located in Fryeburg, Maine.

taken out."[5] BELL stated those people "truly ruin their lives." BELL also empathized with the individual who shot the United HealthCare CEO in December of 2024.[6]

12.     Based upon BELL's statements to the OFFICER, BRIDGTON obtained a state warrant for BELL's arrest for violating Title 17-A, Maine Revised Statutes, Section 209 (criminal threatening with a dangerous weapon). BELL was arrested without incident on April 5, 2025. Following his arrest, BELL was brought to BRIDGTON, where he consented to an interview with special agents from FBI and USSS.

13.     Based upon information provided by the FBI and a special agent with the USSS, both of whom were present for BELL's interview, I am aware that BELL disclosed the following, in summary and in part, after being advised of his *Miranda* rights by federal agents.

---

[5] I believe BELL to be alluding to the assassination attempt on then-Former-President Trump on July 13, 2024, in Butler, Pennsylvania. The FBI identified Thomas Matthew Crooks of Bethel Park, Pennsylvania as the subject involved in the assassination attempt. *See* FBI Press Release, https://www.fbi.gov/news/press-releases/update-on-the-fbi-investigation-of-the-attempted-assassination-of-former-president-donald-trump (accessed April 6, 2025).

[6] I am aware that Luigi Mangione was charged by federal criminal complaint in the Southern District of New York with interstate stalking resulting in death, stalking through use of interstate facilities resulting in death, using a firearm to commit murder, and discharging a firearm equipped with a silencer in furtherance of a crime of violence for the December 4, 2024 killing of Brian Thompson, the CEO of UnitedHealthcare. *See, e.g.,* December 19, 2024 Press Release, https://www.justice.gov/usao-sdny/pr/luigi-mangione-charged-stalking-and-murder-unitedhealthcare-ceo-brian-thompson-and-use (accessed April 6, 2025). Per the Press Release, "Thompson was allegedly killed just because he held the position of chief executive officer of a health insurance company." *Id*. I am also aware that Mangione was indicted by the State of New York in connection with the December 4, 2024 killing of Thompson, with charges including: Murder in the First Degree in furtherance of terrorism; two counts of Murder in the Second Degree; two counts of Criminal Possession of a Weapon in the Second Degree; four counts of Criminal Possession of a Weapon in the Third Degree; Criminal Possession of a Weapon in the Fourth Degree; and Criminal Possession of a Forged Instrument in the Second Degree. *See, e.g.,* December 17, 2024 Press Release, https://manhattanda.org/d-a-bragg-announces-murder-indictment-of-luigi-mangione/ (accessed April 6, 2025).

a. BELL was recently fired from his job at a specific company based out of Kansas City, Missouri because of threats. BELL, a software engineer, indicated the threats were that he was going to put "bugs in his code," as well as leak information should he ever acquire a security clearance. BELL was fired in January 2025.

  i) I understand from open-source searches that the company BELL identified is an aviation company that works with avionic displays, navigation and communication platforms, among other products, in the commercial, corporate, and defense markets.

b. BELL stated there were things about the government he did not like, particularly defense spending on wars. However, BELL quickly stated that he had a "change of heart" and kept stating that was the "old Kevin." When asked when he had the change of heart, BELL stated it was when he got fired.

c. BELL was seeking employment and had an interview lined up with an unmanned-aerial-vehicle company based out of New Hampshire that had military contracts as well as ITAR[7] components.

d. BELL denied making any threats to POTUS during the conversation with the OFFICER. BELL was admonished under 18 U.S.C. § 1001 that it was illegal to lie to federal agents. BELL again denied making threats towards POTUS.

---

[7] ITAR stands for the International Traffic in Arms Regulations.

  e. BELL confirmed he has a pilot's license and flew out of the Oxford County Regional Airport within the past month. BELL was a member of a specific aviation club but the club had recently stopped their plane-rental program.

  f. BELL stated he would fly to Bangor, Augusta, and North Conway, mostly. When asked if he had ever flown to Washington, D.C., BELL stated only commercially on his business trips to Kansas City, which he took every three months. BELL stated there were special permissions he needed to fly outside of the 100 miles allowed by his license, which he had inquired about in the past. When confirming he inquired about going outside of the 100 miles, BELL changed his story to say that he learned about the special permissions from his flight instructor and that he did not inquire specifically about those permissions. BELL was proud of his pilot's license and continued to call it a "privilege" that he would not jeopardize.

14. Based upon FBI's contact with the Federal Aviation Administration ("FAA"), I am aware that BELL holds an FAA-issued Private Pilot Certificate with Airplane Single Engine Land type rating. According to the FAA, this means BELL's certification is only for smaller-type aircraft.[8]

---

[8] I also understand that BELL'S last FAA Medical Certificate was a Third Class certificate issued on June 26, 2015. This would indicate BELL has been flying aircraft without the appropriate medical certificate required by the FAA. An open-source search indicates a third-class medical certificate from the FAA is required for pilots engaging in recreational or private flying, including student pilots and those with a private pilot certificate. It is valid for 60 months under the age of 40 and 24 months for those 40 and older.

15. On April 6, 2025, I, along with the FBI, telephonically interviewed a witness (WITNESS 1) who was at the restaurant at the same time as BELL and the OFFICER. WITNESS 1 disclosed, in summary and in part:

   a. At approximately 12:40 PM EST, WITNESS 1 entered the restaurant and sat to the right of the OFFICER, with a few seats in between them.

   b. WITNESS 1 has known the OFFICER for approximately 25 years.

   c. WITNESS 1 immediately noticed BELL as "odd." BELL was staring at the restaurant employees, talking to himself, and touching clean cups that were on the bar and then putting them back. WITNESS 1 saw BELL staring past the OFFICER—who was sitting between BELL and WITNESS 1—at WITNESS 1. WITNESS 1 also saw BELL staring at the OFFICER.

   d. WITNESS 1 heard BELL ask the OFFICER if the OFFICER was State Police. The OFFICER stated he was not and that he worked in "Public Safety."

   e. WITNESS 1 heard some of the conversation between the OFFICER and BELL revolving around BELL's past encounters with law enforcement but was not listening intently. WITNESS 1 did not hear the direct threat to the POTUS. WITNESS 1 did recall hearing something about a President, but WITNESS 1 was not clear on whether that was a former or the current President. WITNESS 1 recalled hearing the OFFICER say that it would be good not to do that, suggesting BELL might have said a threat at that point, but WITNESS 1 did not hear what the threat was.

## CONCLUSION

16. Based on the forgoing, I submit that probable cause exists to believe that on about April 5, 2025, in the District of Maine, Kevin Bell knowingly and willfully made a threat to take the life of, and to inflict bodily harm upon, the President of the United States, in violation of 18 U.S.C. § 871(a).

I, Bradford Nunan, hereby swear under oath that the information set forth in this affidavit is true and correct to the best of my knowledge, information, and belief, and that I make this oath under pains and penalties of perjury.

Dated at Portland, Maine this 7th day of April 2025.

_____
Bradford Nunan, Special Agent
United States Secret Service

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Apr 07 2025

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title